LORENA BULMAN ET AL., APPELLANTS, V. LYMAN-RICHEY
SAND & GRAVEL CORPORATION, APPELLEE.
13 N. W. 2d 403

FILED MARCH 3, 1944.   No. 31754.

*Morrow & Miller,* for appellants.

*Neighbors & Danielson, contra.*

Heard before SIMMONS, C. J., PAINE, CARTER, MESSMORE,
YEAGER, CHAPPELL and WENKE, JJ.

PAINE, J.

Action brought under workmen's compensation act to re-
cover for accidental death was dismissed on the ground
that plaintiffs were not dependents at the time of the death.
Plaintiffs appealed.

John A. Bulman was in the employ of the Lyman-Richey
Sand & Gravel Corporation, operating a pump on a boat
near Bridgeport, Morrill county, pumping sand and gravel
from a pit, or lake, in which the boat was floating.  On the
night of October 25, 1942, while walking from the boat to

the shore to get some lacing to repair a belt, he fell off the pipe line into the lake and drowned. The weather was unseasonably and extremely cold on this particular night, being near zero, and while one of the crew, who heard the splash when he fell in, threw a rope to him, he was not able to grab it, and his body was recovered about midnight. There is no question but that this fatal accident arose out of and in the course of the employment of the deceased with the defendant corporation.

A petition was filed in the Nebraska workmen's compensation court by the widow, Lorena Bulman, and their minor daughter, Thelma, and the cause was tried before Charles E. Jackman, one of the judges of said court, who dismissed the plaintiffs' petition on the ground that at the time of the accident the plaintiffs were not dependents of the deceased within the meaning of the Nebraska workmen's compensation law. The plaintiffs thereupon filed a waiver of rehearing before the full compensation court, and elected to appeal directly to the district court for Morrill county from said order of dismissal.

In the petition filed it was alleged that deceased was receiving in excess of $50 a week as wages from the defendant; that Lorena Bulman, plaintiff, was the wife of the deceased, and that Thelma Burton Bulman was a minor daughter of the deceased, and 17 years of age, and that deceased was living with his wife and minor children, who were wholly dependent upon him for support at the time of the accident.

In the answer filed in the district court, the defendant denies each and every allegation contained in the petition, and specifically denies that the plaintiffs, or either of them, were dependents of the deceased within the meaning of the Nebraska workmen's compensation law.

Section 48-122, Comp. St. 1929, provides that if death results from injuries, and the deceased leaves one or more dependents wholly dependent upon his earnings for support at the time of the accident causing the injury, compensation shall be paid as therein set out.

Our Nebraska statute also provides: "The following persons shall be conclusively presumed to be wholly dependent for support upon a deceased employee: (a) A wife upon a husband with whom she is living at the time of his death; * * * (d) * * * No compensation shall be payable under this section to a widow, unless she is living with her deceased husband at the time of his death: *Provided,* a wife or husband living in a state of abandonment for more than two years at the time of the injury, or subsequently, shall not be a beneficiary under this article. * * * (e) In all other cases, questions of dependency * * * shall be determined in accordance with the fact, as the fact may be at the time of the injury; * *. * ." Comp. St. 1929, sec. 48-124.

After trial in the district court, the court found generally against plaintiffs, and affirmed the finding and order of the workmen's compensation court dismissing plaintiffs' petition.

The plaintiffs set out in their assignment of errors that the judgment is not supported by the evidence and is contrary thereto, and also contrary to law. It is further alleged that the rulings of the court upon several objections to admission of oral answers and exhibits were prejudicial.

Under the law cited herein, if a wife is living with her husband at the time of his death it is conclusively presumed that she is wholly dependent upon him for support, and entitled to the award provided by law. It therefore becomes a question of fact to be decided by the court, and we will therefore briefly present the matters as tried out in the district court.

When trial began in the district court, counsel for plaintiff submitted the contract of employment between the plaintiffs and the firm of Morrow & Miller, of Scottsbluff, and the court thereupon approved the same in writing, as required by section 48-108, Comp. St. 1929.

The evidence discloses that the wife was notified of the death of her husband out at her home on the farm near Mc-Grew, Scotts Bluff county, the morning after his body was found, and immediately went to Bridgeport with her son Albert to arrange the funeral.

The plaintiff widow told Bern Coulter, the county attorney and *ex officio* coroner, upon arriving at Bridgeport that they had been separated for about seven years and, while he had not contributed anything to her support, they were not divorced.

W. A. Canaday, the undertaker, testified: "She told me standing in the hotel lobby that she and her husband hadn't been living together, but she would claim the body and wanted to give John a good, Christian burial." He further testified that he took the plaintiff and her son out to the sand pit to get the car her husband left there, and they stayed out there quite a little while. She got some money that was taken off his body, and also his automobile, in which her son drove her back to Mr. Canaday's home. He testified that she had met a Mr. Wiles, representing the defendant's insurance carrier, out at the gravel pit, and he followed them to the funeral home to get from her a statement of all the facts.

Mr. Canaday testified that he offered Mr. Wiles the use of his typewriter, but Mr. Wiles thanked him and said that he had his own portable typewriter with him, and that he at once started to write out the facts in the room in his home which he uses as an office; that Mrs. Bulman was not hysterical at all, that she was very calm and collected, that she did not weep nor cry, and that she answered the questions and talked with Mr. Wiles in a perfectly rational way.

Mrs. Ruth M. Canaday, wife of the undertaker, said she sat in the next room in her home, and that the door was open and she could hear Mr. Wiles and Mrs. Bulman talking in the next room while he was writing down the statement, and she heard the conversation with Mr. Wiles, and gave one answer as follows: "I heard her make the statement that she and her husband had not lived together for about seven years and that she didn't even know his whereabouts until she was notified of his death."

This exhibit No. 17, written out at that time, was introduced by the defense, and reads as follows:

"Bridgeport, Nebraska

"October 26, 1942

"Statement of Mrs. Lorena Bulman, wife of John Arthur Bulman. I am 52 years of age. John Arthur Bulman and I have four children, John Arthur, Jr., age 35, last known address, somewhere in Idaho, Albert James Bulman, age 23 living with me, Thornton Burt Bulman, age 17, and Thelma Burton Bulman, age 17. These twins are also living with me.

"My husband has been separated from me for about the past seven years. We have not been divorced but have lived separately for that time. Practically all of this seven years my husband has stayed away from home and has had a separate residence. We just did not get along and we had separate homes.

"During all of this time that we have been separated none of our children nor myself have received any support from my husband John Arthur Bolman. He has not sent us any money, he did not own anything and has not left us anything for our support, nor has he sent us any part of his salary or anything to care for us or any of the children.

"I have bought a farm where we are now living, it is about two miles south and one mile west of McGrew, Nebraska. All of the time my husband has been away from us, we have lived on the farm and managed to get enough to keep us.

"We were married in 1906 at Alliance, Nebraska. During all of the time that I have known my husband, he has never had any serious illnesses and seemed to be perfectly healthy. He did not have any physical defects according to my knowledge. He had some rheumatism in his legs but it was never serious and did not bother him much.

"I have been taking care of the children for the past seven years and John Arthur Bulman has contributed nothing for their support during that time.

"As far as I know there never was any heart trouble with my husband or anything that might have caused his death on October 25, 1942. As far as I know he was drowned

while working at the Lyman Richey Gravel Company near Bridgeport Nebraska.

"I have read my statement and it is true and correct.

"(Signed)   Mrs. Lorena Bulman

"(Signed)   Albert Bulman
            witness"

Upon a very lengthy cross-examination Mrs. Bulman denied that she had given any such statement as exhibit No. 17, or signed any such statement.  Nearly every clause in it was read to her, and while she denied making most of the allegations she did admit that some of them were true, but said she did not remember making or signing any statement, and she did not recall talking to Mr. Wiles that morning at all.  She finally admitted that it was her signature at the bottom of the statement, as well as that of her son.

Albert Bulman signed a written consent, permitting the draft board to disclose what the plaintiff claimed in her application for his deferment.  F. F. Hamilton, chairman of the draft board, read this statement which plaintiff had filed January 31, 1942, which had been sworn to before the county judge, and it read as follows: "We rent our farm near McGrew and my son, the registrant herein, manages it entirely.  He not only looks after me and operates the farm but has been sending his younger brother and sister to school.  The brother and sister are twins of the age of 16.  Under present conditions it is impossible for me to secure anyone else to look after us and we have no income excepting that on which to farm, consisting of 320 acres. My husband has been gone since 1935."

Exhibits Nos. 18 and 19 were applications of Mrs. Bulman, the plaintiff, to rent a farm from the Northwestern National Life Insurance Company of Minneapolis, one lease being for the year 1942, and in these applications it is represented that she is a "widow," and shows that she has borrowed $1,000 in one and $1,500 in the other from the F. S. A. for her live stock, consisting of cows, horses, sheep and hogs.

In the plaintiff's testimony she produced four money or-

der receipts, found among the deceased's papers, showing $20 sent to Albert from Lisco, Nebraska, September 7, 1935, $12 sent Albert July 16, 1935, $24 sent Mrs. J. A. Bulman from Lisco October 11, 1935, and $13 sent Albert from Lisco August 7, 1935. She also testified that after her husband got his car he came home more frequently, and left with the family small sums of money, and also occasionally brought groceries or wearing apparel; that he came home in July, 1935, and usually stayed over night, and in 1939 he was home a week. They occupied the same room, and some letters which passed between them were also received in evidence. This testimony was corroborated by the daughter, Thelma. Thornton, the son, said when the father came home he "always embraced my mother and kissed her, my mother and sister, always shook hands with my brother and I."

The plaintiff's contention is that this evidence indicates that the husband and wife were living together within the law at the time of the death, and that under the Nebraska statute it is therefore conclusively presumed that she is wholly dependent upon him for support.

The defendant quotes in its brief from the case of *Northwestern Iron Co. v. Industrial Commission*, 154 Wis. 97, 142 N. W. 271, Ann. Cas. 1915B, 877, L. R. A. 1916A, 366, to the effect that "The question does not turn on time or distance, but upon the nature and character of the absence and the intention of the parties respecting it. Intent is an important element in determining the nature of absence." In this case an award was made to the wife, who did not accompany her husband when he moved from Austria-Hungary to the United States some three years before, on the ground that he had sent money for the support of his wife and child, having sent her $21 just 17 days before his accidental death, following his declared intention of sending her money every three months.

In the case of *Smith v. Scheidegger Bros.*, 170 Wis. 162, 174 N. W. 462, a wife had nine children, five or six of them being feeble-minded, by her first marriage, and married the

deceased in May, 1912. In April, 1916, he left the farm because he did not like the children, and would not take care of them. He came back occasionally, but worked in a logging camp, where he was taken sick, and his wife visited him in the hospital a week before his death on January 20, 1918. Until this visit to the hospital, she had not seen her husband since November, 1916. These facts denoted an actual separation in the nature of an estrangement, and while the wife claims that just before his death they made plans to live together in the spring, the judgment denying an award was affirmed.

"Under the Workmen's Compensation Act * * * providing that a wife shall be conclusively presumed to be wholly dependent for support upon her husband with whom she lives at the time of his death, where a wife of her own volition left her husband to resume her old occupation of school teacher in another state, because of friction, as she testified, a 'lot of little things came up,' and she thought that her 'going away would bring us together,' she always having in mind the intention to return, and returning, in fact, upon notification by her husband's employer that he had been severely burned, staying with the husband in the hospital some hours before his death, such wife was not a 'dependent' of her deceased husband within the act, since she had severed the marital relation for an indefinite period with only the mere expectation in view that at some indefinite time in the future it would be resumed." *Finn v. Detroit, Mt. C. & M. City Ry.,* 155 N. W. 721 (190 Mich. 112).

Among the tests for the determination of the questions involved in such a case is the following: Were they living together? This is a question of fact, not of law. This contemplates that there had been no break of any serious nature in the marriage relations, although there may be a physical separation, and they may for some time have lived in different towns. If a wife is living apart from her husband for a sufficient and justifiable cause, she may be entitled to compensation if she was dependent upon him.

However, on the other hand, if the parties have been estranged and living apart for some years, and found it unhappy to live together, and were without any plans for again renewing their living together, this is an important consideration. Where the separation is merely for the mutual convenience of the parties, and the wife is dependent, and the obligation to support her is either recognized or performed, the mere fact that the husband, for any reason, fails to perform that duty for a short time, does not deprive the wife of her status as a dependent.

The court must always carefully consider the question whether the deceased husband contributed regularly to his wife's support, and whether they have kept in touch with each other by occasional visits or correspondence more or less regular.

"Where no justifiable cause is shown for living apart, the statutory presumption of dependency is inapplicable, and proof must be made that in fact the husband or wife was dependent. The duration of the separation, the sums contributed, the intention of the parties, and all of the other facts and circumstances are to be considered in determining whether dependency existed. The issue must be determined against the applicant where it appears that separation continued for a considerable period, and that during such time support was derived from other sources than the earnings of the deceased." 28 R. C. L. 777, sec. 70.

In the case at bar, the judge must have given great weight to the statements made by the plaintiff widow in exhibit No. 17, which statements were definite and positive that she had separated from the deceased, was not living with him as man and wife, and that she supported her family by her own unaided efforts. In exhibits Nos. 18 and 19 she had gone to the extent of holding herself out as a widow, perhaps for the greater ease in securing a lease for the farm she desired to rent and later to purchase. Her testimony after she realized that a possible compensation award might come to her because of his death is entirely different from these earlier statements of hers, and this later testimony was not convincing to the trial court, or to this court.

The plaintiff in the case at bar was a woman of great energy and unusual ability, and was perfectly able to bring up her children and support the entire family, and she deserved great credit for her fine record in this regard. However, she never recognized the husband's obligation to support her, and never made any demand on him for support, nor attempted in any way to enforce her rights, and the trifling gifts he may have made did not come within the term "in any way contributing to her support."

The deceased husband had been more or less regularly employed, and earning fair wages, and was rooming at a hotel and boarding at eating houses, keeping a car for his own pleasure, and contributing very little, if anything, to the support of his wife and children, and the wife has been able to support herself and children during the past seven years, without any assistance from him, she is not a dependent upon him in fact or in law, and neither is the minor daughter, who is also a plaintiff.

The judgment of the trial court is therefore affirmed.

AFFIRMED.